This Document Prepared By:
**LASONYA BUNCH JENKINS**
**WELLS FARGO BANK, N.A.**
**3476 STATEVIEW BLVD, MAC# X7801-03K**
**FORT MILL, SC 29715**
**(800) 416-1472**

When Recorded Mail To:
**FIRST AMERICAN TITLE**
**ATTN: LMTS**
**P.O. BOX 27670**
**SANTA ANA, CA  92799-7670**

Tax/Parcel #: ▮▮▮▮▮▮▮▮

_____ |Space Above This Line for Recording Data| _____

**Original Principal Amount: $142,000.00**          Investor Loan No.:
**Unpaid Principal Amount: $136,097.44**           Loan No: (scan barcode)
**New Principal Amount $193,425.69**
**Total Cap Amount: $57,328.25**

## HOME AFFORDABLE MODIFICATION AGREEMENT (MORTGAGE)

Executed on this day: **DECEMBER 16, 2015**
Borrower ("I"):[1] **CARMEN MATOS AKA CARMEN G. MATOS**
Borrower Mailing Address: **902 CHELTENHAM DRIVE, VINELAND, NEW JERSEY 08360**
Lender or Servicer ("Lender"): **DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR HSI ASSET SECURITIZATION CORPORATION TRUST, 2007-WF1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WF1**
Lender or Servicer Address: **1761 EAST ST ANDREW PLACE, SANTA ANA, CA 92705**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") **FEBRUARY 23, 2007** and the Note ("Note") date of **FEBRUARY 23, 2007**

Property Address ("Property"): **902 CHELTENHAM DRIVE, VINELAND, NEW JERSEY 08360**

Legal Description:

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Wells Fargo Custom Home Affordable Modification Agreement – Non-GSE with PRA ▮▮▮▮▮▮
First American Mortgage Solutions                    Page 1                    ▮▮▮▮▮▮▮

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:**

**Prior instrument reference: Recorded on MARCH 21, 2007 in BOOK 4021  PAGE 488, of the Official Records of CUMBERLAND COUNTY, NEW JERSEY**

If my representations in Section 1, Borrower Representations, continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.  **Borrower Representations.**

    I certify, represent to Lender and agree:

    A.  I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  I certify the Property is not condemned and is not vacant without the intent to either re-occupy or rent;

    C.  There has been no impermissible change in the ownership of the Property since I signed the Loan Documents;

    D.  I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));

    E.  Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.  If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and,

    G.  I have made or will make all payments required within this modification process.

    H.  If borrower has filed for or received a discharge in a bankruptcy proceeding subsequent to or in conjunction with the execution of this Agreement and said debt was not reaffirmed during the course of the proceeding, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement and may only enforce the lien as against the property.

2.  **Acknowledgements and Preconditions to Modification.**

    I understand and acknowledge that:

    A.  If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my

representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and,

B.  I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

C.  If included, the undersigned borrower(s) acknowledges receipt and acceptance of the Notice of Special Flood Hazard disclosure.

3.  **The Modification**.

If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **FEBRUARY 1, 2016** and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a Mortgage Assistance or trial period plan, this modification will not take effect. The first modified payment will be due on **FEBRUARY 1, 2016**.

A.  The new Maturity Date will be: **MAY 1, 2037**.

B.  The modified principal balance of my Note will include amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, valuation, property preservation, and other charges not permitted under the terms of the HAMP modification, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$193,425.69** (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  **$95,804.22** of the New Principal Balance shall be an interest bearing lump sum payment and I will pay interest on this amount in my monthly modified payment. This lump sum shall be due at time of loan maturity or earlier upon payoff of the loan. In addition, **$20,925.69** of the Deferred Balance is eligible for forgiveness (the "Deferred Principal Reduction Amount"). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of **OCTOBER 1, 2015**, the lender shall reduce the Deferred Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Reduction Amount shall be referred to as the "Interest Bearing Principal Balance" and this amount is **$172,500.00**. Interest at the rate of **2.0000%** will begin to accrue on the Interest Bearing Principal Balance as of **JANUARY 1, 2016** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **FEBRUARY 1, 2016**. Interest due on each monthly payment will be calculated by multiplying the New Principal/Interest Bearing Principal Balance and the interest rate in effect at the time of calculation and dividing the result by twelve

(12).  My payment schedule for the modified loan is as follows:

| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment | Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On |
|--------|--------------|---------------------------|----------------------------------------|-------------------------------|------------------------|-------------------|
| 60 | 2.0000% | 01/01/2016 | $564.96 | $435.62 | $1,000.58 | 02/01/2016 |
| 12 | 3.0000% | 01/01/2021 | $645.83 | $435.62 | $1,081.45 | 02/01/2021 |
| 183 | 4.0000% | 01/01/2022 | $730.32 | $435.62 | $1,165.94 | 02/01/2022 |
| Balloon | 4.0000% | N/A | $95,804.22 which is an estimated amount | | | 05/01/2037 |

**\*This includes an escrow shortage amount to be paid over the first 60 month term. After your modification is complete, escrow payments adjust at least annually in accordance with applicable law therefore, the total monthly payment may change accordingly.**

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

I further understand that, provided I am not in default under the terms of this Agreement and I pay my Note in full (i) any time more than 30 calendar days after the Modification Effective Date, and (ii) prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my payoff balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C

F.  I agree to pay in full the Deferred Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

**Notice to Borrower:** The Deferred Balance will result in a lump sum payment due at the time of loan maturity or earlier upon payoff of the loan. If you do not have the funds to pay the lump sum payment when it comes due, you may have to obtain a new loan against your property. In that case, you may have to pay commissions, fees, and expenses for the arranging of the new loan. In addition, if you are unable to make the monthly payments or the lump sum payment, you may lose

the property and all of your equity through foreclosure. Keep this in mind in deciding upon this modification. The lump sum payment on this loan is due **MAY 1, 2037** or upon earlier payoff of the loan.

4. **Additional Agreements**.

I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Mortgage Assistance that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account.

E. **Funds for Escrow Items.** I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.E. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.E.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

F. That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

G. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property

will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

J.  That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

K.  That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

L.  That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

M.  That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

N.  I agree, that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.O. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O.  That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

P.  CORRECTION AGREEMENT: The undersigned Borrower(s), for and in consideration of the approval, closing and funding of this Modification, hereby grants, **Wells Fargo Home Mortgage**, as lender, limited power of attorney to correct and/or initial all typographical or clerical errors discovered in the Modification Agreement required to be signed. In the event this limited power of

attorney is exercised, the undersigned will be notified and receive a copy of the document executed or initialed on their behalf. This provision may not be used to modify the interest rate, modify the term, modify the outstanding principal balance or modify the undersigned's monthly principal and interest payments as modified by this Agreement. Any of these specified changes must be executed directly by the undersigned. This limited power of attorney shall automatically terminate in 120 days from the closing date of the undersigned's Modification.

Q. If the mortgage is a biweekly mortgage with payments due every two weeks, through the attached modification agreement, the Loan will convert to a MONTHLY payment schedule. To accommodate monthly payments, interest will be charged based on a 12 month year and a 30 day month. As part of the conversion from biweekly to monthly payments, any automatic withdrawal of payments (auto drafting) in effect with Lender for the Loan is cancelled. Complete the enclosed Automatic Loan Payment Authorization form to establish automatic payment drafting.

R. If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit. This means that I cannot obtain additional advances and must make payments according to this Agreement. (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit and if so, I confirm and acknowledge that no additional advances may be obtained.)

S. By signing this Agreement the Borrower hereby consents to being contacted concerning their loan at any cellular or mobile telephone number they may have. This includes text messages and telephone calls including the use of automated dialing systems to contact any cellular or mobile telephone. The Borrower may be billed by the cellular or mobile carrier for any text messages that Lender may send. Any calls Lender places to the Borrower's cellular or mobile phone may incur normal airtime charges assessed by the mobile carrier.

**All Borrowers are required to sign and date this Agreement in blue or black ink only as your name appears below. If signed using any other color or method, the document will not be accepted and another copy of the Agreement will be sent to you to be signed.**

**By signing below, all Borrowers certify they have read this Agreement in its entirety, that all Borrowers know and understand the meaning and intent of this Agreement and that all Borrowers enter into this Agreement knowingly and voluntarily. By signing below, all Borrowers agree to all terms and conditions described on every page of this Agreement.**

In Witness Whereof, I have executed this Agreement.

_Carmen B. Mato_

Borrower: CARMEN MATOS AKA CARMEN G. MATOS

_1, 5 2016_
Date

_____

Borrower:                                                    Date

_____

Borrower:                                                    Date

_____

Borrower:                                                    Date

_____ [Space Below This Line for Acknowledgments] _____

## BORROWER ACKNOWLEDGMENT

State of __New Jersey__

County of __Cumberland__ , SS:

I CERTIFY that on __5__ , __January__ , 20 __16__ , **CARMEN MATOS AKA CARMEN G. MATOS** personally came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one each person):

a.   is named in and personally signed the attached document; and

b.   signed and delivered this document as his/her/their act and deed.

_Ahmad S. Graves-El_
Notary Public

Print Name: __Ahmad S. Graves-El__

My commission expires: _____

**AHHMAD S. GRAVES-EL**
**NOTARY PUBLIC OF NEW JERSEY**
**ID # 2440435**
**My Commission Expires 11/13/2018**



In Witness Whereof, the Lender have executed this Agreement.

**WELLS FARGO BANK, NA AS ATTORNEY-IN-FACT FOR DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR HSI ASSET SECURITIZATION CORPORATION TRUST, 2007-WFI, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-WFI**

By: (print name) _____     (sign) _____     Date _____

    (title) _____

_____ [Space Below This Line for Acknowledgments] _____

STATE OF _____

COUNTY OF _____ ) ss

I    CERTIFY    that    on    this_____    day    of_____ ,    20_____ ,
_____ personally came before me and stated to my
satisfaction that this person (or if more than one, each person):

    (a)  Was the maker of the attached instrument;

    (b)  Was authorized to and did execute this instrument as
        _____ of the company, the entity named in this
        instrument; and,

    (c)  Executed this instrument as the act of the entity named in this instrument

_____

(Print name and title below signature)

Signed and sworn to before me on _____ , 20____

_____

Notary Public

Printed Name: _____

My commission expires: _____

**EXHIBIT A**

**BORROWER(S):  CARMEN MATOS AKA CARMEN G. MATOS**

**LOAN NUMBER:  (scan barcode)**

**LEGAL DESCRIPTION:**

**BEGINNING AT A POINT ON THE WESTERLY SIDE OF CHELTENHAMDRIVE, 94.72 FEET NORTH 8° EAST OF ITS INTERSECTION WITH THE NORTHERLY SIDE OF MANCHESTER DRIVE, AND EXTENDING THENCE; (1) NORTH 8° EAST, ALONG THE WESTERLY SIDE OF CHELTENHAMDRIVE, 76.0 FEET TO A CORNER OF LOT 7, THENCE; (2) NORTH 82° WEST, ALONG LOT 7, 150.0 FEET TO A POINT IN THE LINE OF SCHWARTZBARD; THENCE (3) SOUTH 8° WEST, ALONG THE SAME, 76.0 FEET TO A CORNER OF LOT 9; THENCE; (4) SOUTH 82° EAST, ALONG LOT 9, 150.0 FEET TO THE WESTERLY SIDE OF CHELTENHAM DRIVE AND THE POINT OF BEGINNING. BEING ALL OF LOT 8, BLOCK 428-A OF BRADFORD HEIGHTS., SECTION 1 SUBJECT TO RESTRICTIONS IMPOSED BY BRADFORD HEIGHTS, INC., IN THE DEED POLL DECLARATION, DATED MAY 30, 1972, RECORDED IN BOOK 1194, PAGE 842.**

**ALSO KNOWN AS: 902 CHELTENHAM DRIVE, VINELAND, NEW JERSEY 08360**

## BALLOON NOTE
*(Fixed Rate)*

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

February 23, 2007                EGG HARBOR                    NEW JERSEY
                                   *City*                        *State*

902 CHELTENHAM DRIVE, VINELAND, NJ  08360
                                   *Property Address*

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.   $142,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is _____ WELLS FARGO BANK, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  9.750%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on April, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2022     I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at:
  WELLS FARGO BANK, N.A.
  P.O. BOX 11701, NEWARK, NJ  07101-4701
or at a different place if required by the Note Holder.

#### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S.   $1,220.00.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Note-Balloon                                Form 3260  1/01              EC060L  REV. 09/06/02
                                                                          PAGE 1 OF 3

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of
15 calendar days after the date it is due, I will pay a late charge to the Note Holder.
The amount of the charge will be   5.000% of my overdue payment of principal and interest.
I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in
default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay
the overdue amount by a certain date, the Note Holder may require me to pay immediately the full
amount of Principal which has not been paid and all the interest that I owe on that amount.  That
date must be at least 30 days after the date on which the notice is mailed to me or delivered by
other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately
in full as described above, the Note Holder will still have the right to do so if I am in default
at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note
Holder will have the right to be paid back by me for all of its costs and expenses in
enforcing this Note to the extent not prohibited by applicable law.  Those expenses
include, for example, reasonable attorneys' fees.

## 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this
Note will be given by delivering it or by mailing it by first class to me at the Property Address
above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by
first class mail to the Note Holder at the address stated in Section 3(A) above or at a different
address if I am given a notice of that different address.

## 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep
all of the promises made in this Note, including the promise to pay the full amount owed.  Any
person who is a guarantor, surety or endorser of this Note is also obligated to do these things.
Any person who takes over these obligations, including the obligations of a guarantor, surety or
endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note
Holder may enforce its rights under this Note against each person individually or against all of
us together.  This means that any one of us may be required to pay all of the amounts owed under
this Note.

## 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and
Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment
of amounts due.  "Notice of dishonor" means the right to require the Note Holder to give notice
to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to
the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security
Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from
possible losses which might result if I do not keep the promises which I make in this Note.  That
Security Instrument describes how and under what conditions I may be required to make immediate
payment in full of all amounts I owe under this Note.  Some of those conditions read as
follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section
18, "Interest in the Property" means any legal or beneficial interest in the Property,
including, but not limited to, those beneficial interests transferred in a bond for deed,
contract for deed, installment sales contract or escrow agreement, the intent of which is the
transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or
transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is
sold or transferred) without Lender's prior written consent, Lender may require immediate
payment in full of all sums secured by this Security Instrument.  However, this option shall
not be exercised by Lender if such exercise is prohibited by applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice
shall provide a period of not less than 30 days from the date the notice is given in accordance
with Section 15 within which Borrower must pay all sums secured by this Security Instrument.
If Borrower fails to pay these sums prior to expiration of this period, Lender may invoke any
remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
CARMEN MATOS                              -Borrower

(Sign Original Only)

WITHOUT RECOURSE
PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.

BY: _____
JOANN M. MILLS, VICE PRESIDENT

## BALLOON COMMITMENT LETTER ADDENDUM
## 15 YEAR PRODUCT

This is an addendum to your loan commitment dated  February 23, 2007
and is a part thereof.

THE TERM OF THE LOAN IS FIFTEEN YEARS.  AS A RESULT, YOU WILL BE
REQUIRED TO REPAY THE ENTIRE PRINCIPAL BALANCE AND ANY ACCRUED
INTEREST THEN OWING FIFTEEN YEARS FROM THE DATE ON WHICH THE LOAN
IS MADE.

THE LENDER HAS NO OBLIGATION TO REFINANCE THIS LOAN AT THE END
OF ITS TERM.  THEREFORE, YOU MAY BE REQUIRED TO REPAY THE LOAN
OUT OF ASSETS YOU OWN OR YOU MAY HAVE TO FIND ANOTHER LENDER
WILLING TO REFINANCE THE LOAN.

ASSUMING THIS LENDER OR ANOTHER LENDER REFINANCES THE LOAN
AT MATURITY, YOU WILL PROBABLY BE CHARGED INTEREST AT MARKET
RATES PREVAILING AT THAT TIME AND SUCH RATE MAY BE HIGHER THAN
THE INTEREST RATE ON THIS LOAN.  YOU MAY ALSO HAVE TO PAY SOME
OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH THE NEW
MORTGAGE LOAN.

AT MATURITY, ASSUMING THERE IS NO CHANGE IN THE INTEREST RATE OR
OTHER LOAN CHARACTERISTICS SET FORTH IN THIS COMMITMENT, THE
BALLOON PAYMENT WILL BE   $116,383.12.

EU018L  Rev. 08/20/99

### Assignment of Mortgage
#### Know all Men by these Presents:

*That* **Wells Fargo Bank, N.A.**

*located at* **P.O. Box 85071, San Diego, CA 92186-5071** *,herein designated as the Assignor, for and in consideration of the sum of* ONE DOLLAR AND 00/100 (**$1.00**) *and other good and valuable consideration, the receipt whereof is hereby acknowledged, does by these presents assign to*

#### Deutsche Bank National Trust Company, as Trustee for HSI ASSET SECURITIZATION CORPORATION TRUST 2007-WF1

*located at* **1761 E. St. Andrews Place, Santa Ana, CA 92705-4934** *, herein designated as the Assignee, a certain Mortgage made by Carmen G. Matos, as unmarried  on lands located in the City of Vineland in the County of Cumberland and State of New Jersey, to secure payment of the sum of  $142,000.00 Dollars which mortgage was recorded or registered in the office of the Clerk of Cumberland County on March 21, 2007in Book 4021 of Mortgages at page  488  #273086*

     *Together with the Bond, Note or other Obligation therein described, and the money due and to grow due thereon, with the interest. To have and to hold the same unto the said Assignee forever, subject only to all the provisions contained in the said Mortgage and the Bond, Note or other Obligation. And the said Assignor hereby constitutes and appoints the Assignee as the Assignor's true and lawful attorney, irrevocable in law or in equity, in the Assignor's name, place and stead but at the Assignee's cost and expense, to have, use and take all lawful ways and means for the recovery of all the said money and interest; and in case of payment, to discharge the same as fully as the Assignor might or could do if these presents were not made.  This assignment is without recourse for any reason whatsoever.*

     *In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.*

     **In Witness Whereof,** *the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed this 4th day of August, 2010.*

**Attested by**

                                        Wells Fargo Bank, N.A.

                           BY:

JAMES MURPHY, WITNESS                    Brian C. Nicholas    , Attorney-in-Fact

### CORPORATE ACKNOWLEDGEMENT

*STATE OF NEW JERSEY, COUNTY OF UNION:*

     *I CERTIFY that on August 4, 2010 ,*    Brian C. Nicholas   *personally came before me and this person acknowledged under oath, to my satisfaction that:*

     *(a)*     *this person signed, sealed and delivered the attached document as  Power of Attorney of  Wells Fargo Bank, N.A., the corporation named in this document;*

     *(b)*     *the proper corporate seal was affixed; and*

     *(c)*     *this document was signed and made by the corporation as its voluntary act and deed by virtue of authority from its Board of Directors.*

Signed and sworn to before me on this
4th day of August, 2010

Notary Public of

LILIAN DIAZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires October 23, 2012

Record and return to:
ZUCKER, GOLDBERG & ACKERMAN, LLC
200 Sheffield Street, Suite 301
P.O. Box 1024
Mountainside, NJ 07092-0024

OK

✓

# RECORDING INFORMATION SHEET

**CUMBERLAND COUNTY CLERK'S OFFICE**
**60 WEST BROAD STREET**
**BRIDGETON NJ 08302**

| INSTRUMENT NUMBER: | DOCUMENT TYPE : |
|---|---|
| **373379** | **ASSIGN MTG** |

**Official Use Only**

GLORIA NOTO, COUNTY CLERK
CUMBERLAND COUNTY, NJ

INSTRUMENT NUMBER
373379
RECORDED ON
August 9, 2010  01:20 pm
BOOK:4073  PAGE:3989

PMR

**Return Address** *(for recorded documents)*
ZUCKER GOLDBERG & ACKERMAN
200 SHEFFIELD STREET-SUITE 301
P O BOX 1024
MOUNTAINSIDE NJ 07092-0024

| | | |
|---|---|---|
| **No. Of Pages** *(excluding Summary Sheet)* | | 1 |
| **Recording Fee** *(excluding Transfer Tax)* | | $40.00 |
| **Realty Transfer Tax** | | $0.00 |
| **Amount Charged** | **(Check** ▮ **)** | $40.00 |
| **Parcel Information** | **Block** | |
| | **Lot** | |
| **First Party Name** | WELLS FARGO BANK | |
| **Second Party Name** | DEUTSCHE BANK NATIONAL TRUST | |

MAIL COPY _____
NO COPY _____
ENVELOPE ✓

ADDITIONAL STAMPINGS _____

**Additional Information (Official Use Only)**

▮▮▮▮▮▮▮

***************************** *DO  NOT REMOVE  THIS  PAGE.*****************************
*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF CUMBERLAND COUNTY FILING RECORD*
******************* *RETAIN THIS PAGE FOR FUTURE REFERENCE.* *******************

# RECORDING INFORMATION SHEET

**CUMBERLAND COUNTY CLERK'S OFFICE**
**60 WEST BROAD STREET**
**BRIDGETON NJ 08302**

| INSTRUMENT NUMBER: | DOCUMENT TYPE: |
|---|---|
| **273086** | **MORTGAGE** |

**Official Use Only**

GLORIA NOTO, COUNTY CLERK
CUMBERLAND COUNTY, NJ

INSTRUMENT NUMBER
273086
RECORDED ON
March 21, 2007  10:34 am
BOOK:4021  PAGE:488

RMG

**Return Address** *(for recorded documents)*

INDEPENDENCE ABSTRACT & TITLE AGENC
1040 KINGS HWY NORTH
SUITE 700
CHERRY HILL NJ 08034

| | | |
|---|---|---|
| **No. Of Pages** *(excluding Summary Sheet)* | | 19 |
| **Recording Fee** *(excluding Transfer Tax)* | | $210.00 |
| **Realty Transfer Tax** | | $0.00 |
| **Amount Charged** | (Check # ▓▓▓) | $210.00 |
| **Parcel Information** | **Block** | |
| | **Lot** | |
| **First Party Name** | CARMEN G MATOS | |
| **Second Party Name** | WELLS FARGO BANK | |

MAIL COPY _____
NO COPY _____
ENVELOPE _____

ADDITIONAL STAMPINGS _____

**Additional Information (Official Use Only)**

***************************** *DO  NOT REMOVE  THIS  PAGE.* *******************************
*COVER SHEET (DOCUMENT SUMMARY FORM) IS PART OF CUMBERLAND COUNTY FILING RECORD*
******************** *RETAIN THIS PAGE FOR FUTURE REFERENCE.* *********************

Return To:
WELLS FARGO BANK, N.A.
FINAL DOCUMENTS X9999-01M
1000 BLUE GENTIAN ROAD
EAGAN, MN 55121-1663

Record & Return To:
Independence Abstract & Title Agency
1040 Kings Highway North
Suite 700
Cherry Hill, NJ 08034
(856) 779-0099

Prepared By:
CHRIS J. ZOERB
WELLS FARGO BANK, N.A.
2650 WELLS FARGO WAY
MINNEAPOLIS, MN 55408-

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are
defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used
in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **FEBRUARY 23, 2007**
together with all Riders to this document.
**(B) "Borrower"** is
**CARMEN G MATOS, AS UNMARRIED**

Borrower is the mortgagor under this Security Instrument.
*(C) "Lender" is* **WELLS FARGO BANK, N.A.**

Lender is a **National Association**
organized and existing under the laws of **THE UNITED STATES OF AMERICA**

**NEW JERSEY-** Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**       **FORM 3031   1/01**
Page 1 of 17        Initials: _CM_       SNJ01   Rev 08/13/01

Lender's address is
**P. O. BOX 5137, DES MOINES, IA  50306-5137**
Lender is the mortgagee under this Security Instrument.
**(D) "Note "** means the promissory note signed by Borrower and dated **FEBRUARY 23, 2007** .
The Note states that Borrower owes Lender **ONE HUNDRED FORTY-TWO THOUSAND AND
NO/100**                                                                    Dollars
(U.S. $ ...142,000.00..............) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than **MARCH 1, 2022**
**(E) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ *Second Home Rider* |
| ☒ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes,
*regulations, ordinances and administrative rules and orders (that have the effect of law) as*
well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of,
or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
*amended from time to time, or any additional or successor legislation or regulation that*

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA. **(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the

|  |  |  |  |
|---|---|---|---|
| **County** | of | **CUMBERLAND** | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.**

Property Account Number:             which currently has the address of
**902.CHELTENHAM DRIVE**                                             [Street]
**VINELAND**                   [City], New Jersey      **08360**      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

SNJ03    Rev 11/08/00          Page 3 of 17          Initials _____          **FORM 3031    1/01**

*Independence Abstract & title Agency*

**6712 Washington Ave. Suite 102
Egg Harbor Twp., NJ 08234
Telephone: 609-645-8881 Fax: 609-645-7765
www.independenceabstract.com**

Agents for
### *Fidelity National Title Insurance Company*

## SCHEDULE C
## LEGAL DESCRIPTION

**File Number:** ▇▇▇▇▇▇▇

ALL that certain lot, parcel or tract of land, situate and lying in the City of Vineland, County of Cumberland, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point on the Westerly side of Cheltenham Drive, 94.72 feet North 8 degrees East of its intersection with the Northerly side of Manchester Drive, and extending thence;

(1) North 8 degrees East, along the Westerly side of Cheltenham Drive, 76.0 feet to a corner of Lot 7; thence

(2) North 82 degrees West, along Lot 7, 150.0 feet to a point in the line of Schwartzbard; thence

(3) South 8 degrees West, along the same, 76.0 feet to a corner of Lot 9; thence

(4) South 82 degrees East, along Lot 9, 150.0 feet to the Westerly side of Cheltanham Drive and the point of Beginning.

FOR INFORMATIONAL PURPOSES ONLY:  Commonly known as:  902 Cheltenham Drive, Vineland, NJ 08360.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 8 in Block 677.01 on the City of Vineland Tax Map.

BB

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the
Note and any prepayment charges and late charges due under the Note. Borrower shall
also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and
this Security Instrument shall be made in U.S. currency. However, if any check or other
instrument received by Lender as payment under the Note or this Security Instrument is
returned to Lender unpaid, Lender may require that any or all subsequent payments due
under the Note and this Security Instrument be made in one or more of the following forms,
as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's
check or cashier's check, provided any such check is drawn upon an institution whose
deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds
Transfer.

Payments are deemed received by Lender when received at the location designated in
the Note or at such other location as may be designated by Lender in accordance with the
notice provisions in Section 15. Lender may return any payment or partial payment if the
payment or partial payments are insufficient to bring the Loan current. Lender may accept
any payment or partial payment insufficient to bring the Loan current, without waiver of any
rights hereunder or prejudice to its rights to refuse such payment or partial payments in the
future. If Lender accepts such payments, it shall apply such payments at the time such
payments are accepted. No offset or claim which Borrower might have now or in the future
against Lender shall relieve Borrower from making payments due under the Note and this
Security Instrument or performing the covenants and agreements secured by this Security
Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2,
all payments accepted and applied by Lender shall be applied in the following order of
priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due
under Section 3. Such payments shall be applied to each Periodic Payment in the order in
which it became due. Any remaining amounts shall be applied first to late charges, second
to any other amounts due under this Security Instrument, and then to reduce the principal
balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which
includes a sufficient amount to pay any late charge due, the payment may be applied to the
delinquent payment and the late charge. If more than one Periodic Payment is outstanding,
Lender may apply any payment received from Borrower to the repayment of the Periodic
Payments if, and to the extent that, each payment can be paid in full. To the extent that any
excess exists after the payment is applied to the full payment of one or more Periodic
Payments, such excess may be applied to any late charges due. Voluntary prepayments
shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to
principal due under the Note shall not extend or postpone the due date, or change the
amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments
are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for
payment of amounts due for: (a) taxes and assessments and other items which can attain

SNJ04   Rev 11/08/00                Page 4 of 17          Initials: _____          FORM 3031   1/01

priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required

by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the

Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

SNJ07   Rev 10/20/00          Page 7 of 17          Initials: C G M          FORM 3031   1/01

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and

have utilities turned on or off. Although Lender may take action under this Section 9,
Lender does not have to do so and is not under any duty or obligation to do so. It is agreed
that Lender incurs no liability for not taking any or all actions authorized under this Section
9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of
Borrower secured by this Security Instrument. These amounts shall bear interest at the
Note rate from the date of disbursement and shall be payable, with such interest, upon
notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the
provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the
fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of
making the Loan, Borrower shall pay the premiums required to maintain the Mortgage
Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender
ceases to be available from the mortgage insurer that previously provided such insurance
and Borrower was required to make separately designated payments toward the premiums
for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage
substantially equivalent to the Mortgage Insurance previously in effect, at a cost
substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in
effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent
Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the
amount of the separately designated payments that were due when the insurance coverage
ceased to be in effect. Lender will accept, use and retain these payments as a
non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be
non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender
shall not be required to pay Borrower any interest or earnings on such loss reserve.
Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the
amount and for the period that Lender requires) provided by an insurer selected by Lender
again becomes available, is obtained, and Lender requires separately designated payments
toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a
condition of making the Loan and Borrower was required to make separately designated
payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums
required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss
reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any
written agreement between Borrower and Lender providing for such termination or until
termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's
obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain
losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party
to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to
time, and may enter into agreements with other parties that share or modify their risk, or
reduce losses. These agreements are on terms and conditions that are satisfactory to the
mortgage insurer and the other party (or parties) to these agreements. These agreements
may require the mortgage insurer to make payments using any source of funds that the

mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture** . All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property, in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the

following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not

personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under

Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights

under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement· by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and

(d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any *Hazardous Substances, or threaten to release any Hazardous Substances, on or in the* Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other *remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall* promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the** *notice may result in acceleration of the sums secured by this Security Instrument,* **foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require** *immediate payment in full of all sums secured by this Security Instrument without further* **demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
                                          CARMEN MATOS               Borrower

_____

**STATE OF NEW JERSEY,  CUMBERLAND**                                    **County ss:**

On this  **23RD**    day of    **FEBRUARY, 2007**            , before me, the subscriber,
personally appeared
**CARMEN G MATOS, AS UNMARRIED**

who, I am satisfied, is/are the person(s) named in and who executed the within instrument,
and there upon acknowledged that he/she/they signed, sealed and delivered the same as
his/her/their act and deed, for the purposes therein expressed.

_____
Notary Public

PATRICIA A. PAPANIA
NOTARY PUBLIC OF NEW JEF 'EY
My Commission Expires July 20, 2010

Initials: *CMM*          **FORM 3031**    **1/01**

# BALLOON RIDER

THIS BALLOON RIDER is made on this 23rd day of FEBRUARY, 2007............and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to WELLS FARGO BANK, N.A. ("Lender") of the same date and covering the property described in the Security Instrument and located at: 902 CHELTENHAM DRIVE
VINELAND, NJ 08360

*(Property Address)*

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the "Note Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

ADDITIONAL COVENANTS. In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or the Note):

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

At least ninety (90) but not more than one hundred twenty (120) days prior to Maturity Date, Lender must send Borrower a notice which states the Maturity Date and the amount of the "Balloon Payment" which will be due on the Maturity Date (assuming all scheduled payments due between the date of the notice and the Maturity Date are made on time).

*Carmen D Matos* _____ (SEAL)
CARMEN MATOS                              (Borrower)

FC0731  Rev. 12/05/00